In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 07-1245 & 07-1464

FEDERAL INSURANCE COMPANY,

*Plaintiff-Appellant, Cross-Appellee,*

*v.*

ARTHUR ANDERSEN LLP and LARRY J. GORRELL,

*Defendants-Appellees, Cross-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1174—**Amy J. St. Eve**, *Judge*.

_____

ARGUED FEBRUARY 20, 2008—DECIDED APRIL 9, 2008

_____

Before EASTERBROOK, *Chief Judge*, and BAUER and WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. When the accounting firm Arthur Andersen was indicted in the wake of Enron's collapse, it lost most of its clients. Active accountants could move to other firms, whose business boomed after the Sarbanes–Oxley Act compelled firms to purchase more accounting services than ever before. Retirees, however, were in trouble, for Arthur Andersen's pension plan was unfunded. Although ERISA requires plans

within its scope to be established as trusts and funded either fully (for defined-contribution plans) or according to a formula (for defined-benefit plans), the statute covers only plans for "employees." Arthur Andersen treated its senior accountants as "partners" rather than "employees" and thus as outside of ERISA.

For many years Arthur Andersen capitalized the retirees' benefits and disbursed lump sums on request. (Whether that was the retirees' contractual right, or just an accommodation that the firm was free to discontinue, was hotly disputed but is not pertinent now.) With the firm's collapse looming, retirees *en masse* demanded lump-sum distributions. That created the equivalent of a run on a bank. If Arthur Andersen paid 100% to the retirees who got in line first, the rest stood to receive nothing. If it stopped all lump-sum distributions, then it might be able to pay some portion of all retirees' claims—and perhaps more in the aggregate than it could distribute if it followed a first-come, first-served policy. So Arthur Andersen told its retirees that it would continue monthly pension payments but would not honor any requests for lump-sum distributions, though it would explore the possibility of cashing out all retirees at a reduced level.

Litigation ensued. The first two complaints were filed in March 2002. The parties call that litigation the *Buchholz/ Bryce* proceeding after the two lead plaintiffs. They alleged, among other things, that the retirees had been employees rather than partners, that ERISA therefore required retirement benefits to be funded through a trust, and that Arthur Andersen is liable for breach of this statutory duty. Those claims potentially came within the scope of insurance policies such as the one issued by Federal Insurance Co., which covered negligent or deliberate breach of fiduciary

duties owed to retirees. In May 2002 Arthur Andersen's insurance broker first informed Federal Insurance about the *Buchholz/Bryce* litigation. The letter told Federal Insurance (and several other insurers) about the suits, stated that Arthur Andersen had retained Mayer, Brown, Rowe & Maw (now Mayer Brown LLP) to represent it, and directed the insurers to deal with Arthur Andersen on this matter through the broker rather than through Mayer Brown. The broker did not ask Federal Insurance to provide a defense (Mayer Brown already was doing that) but did ask it to "confirm coverage" and chip in toward the cost of Mayer Brown's services. Federal Insurance replied within a week that it was reserving its rights, and it asked for a copy of the partnership agreement (so that it could evaluate the plaintiffs' claims) and a schedule of Mayer Brown's rates.

Follow-up requests were unavailing until August 2002, when the broker finally provided Federal Insurance with the information—plus the news that the *Buchholz/Bryce* complaint had been dismissed by the plaintiffs, who (the broker said) planned to inaugurate arbitration instead. Since there was neither a suit nor an arbitration pending—at least none of which Federal Insurance had been notified—nothing happened for the next month.

In September 2002 the broker told Federal Insurance that there was indeed another complaint, the *Waters* suit, which had been filed in a California court in July 2002. Once again the letter did not request a defense but did ask Federal Insurance to consent to Mayer Brown's role as Arthur Andersen's lawyer. In November Arthur Andersen proposed a compromise to all retirees and wrote to its insurers that it needed at least $75 million from them to fund a settlement; it asked Federal Insurance to pay the

policy limit of $25 million. But Federal Insurance had read the *Waters* complaint and learned that it did not make any claim that Arthur Andersen (or any of its managers) had acted negligently or breached any fiduciary duty. *Waters* was a pure contract action: the complaint asserted that every retiree was entitled by contract to immediate distribution of retirement funds. Federal Insurance's policy excludes claims for retirement benefits due under contracts, and it told Arthur Andersen that it would not contribute toward a settlement fund. In January 2003 Arthur Andersen settled with most retirees for $168 million (the rest settled in 2006 for a further $63 million), a fraction of the outstanding retirement balances.

When Federal Insurance filed this diversity action in February 2003, seeking a declaration that it was not required to defend or indemnify Arthur Andersen, it was met with a response (and counterclaim) seeking indemnity not only under the policy's terms but also on a theory of estoppel because of failure to participate in the defense of the suits. The district judge wrote a comprehensive opinion, 2005 U.S. Dist. LEXIS 15706 (N.D. Ill. Aug. 2, 2005), that reached two fundamental conclusions: first, the policy did not require Federal Insurance to indemnify Arthur Andersen for payments to the retirees, but, second, its failure to provide a defense coupled with its delay in filing the declaratory-judgment action might require it to pay anyway, as a matter of Illinois law (which the parties agree supplies the rule of decision).

A jury trial was held. The jury decided that, for the most part, Federal Insurance's delay was justifiable, but that it should have acted earlier with respect to the *Waters* suit and some other retirees' actions. After trial, the district judge granted judgment as a matter of law, see Fed. R. Civ.

P. 50, in favor of Federal Insurance with respect to every-thing other than the *Waters* claim, because the additional matters on which the jury found against Federal Insurance had not begun until after February 2003, and Federal Insurance could not have been deemed to tarry unduly concerning those.

Federal Insurance was ordered to pay Arthur Andersen approximately $5 million to cover the cost of settling the claims of the retirees who had joined in *Waters*; other-wise judgment went in favor of Federal Insurance. Both sides have appealed. We take up the *Waters* claim first, because if Federal Insurance prevails on that claim it wins everything else too.

Like the district court, we conclude that the policy does not call for indemnity. It defines as a covered loss any injury caused by negligence or a breach of fiduciary duty. The retirees were not injured in that way; their problem stemmed from Arthur Andersen's business and legal difficulties. (The firm ultimately prevailed in the crim-inal prosecution, see *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), but never recovered in the market.) In bank-run situations, a fiduciary does exactly what Arthur Andersen did: it defers payments so that all creditors can be treated alike and may receive a higher percentage of their investments than would be possible if the fiduciary liquidated assets on short notice to pay the early demand-ers immediately and in full.

The policy's exclusion for pension benefits also applies. Even if, as Arthur Andersen insists, the firm had a right to reduce or eliminate the benefits, the fact remains that the settlement reflects the present value of the pension promises (less a haircut reflecting Arthur Andersen's business distress) rather than damages for anyone's

misconduct. No insurer agrees to cover pension benefits; moral hazard would wipe out the market. As soon as it had purchased a policy, the employer would simply abandon its pension plan and shift the burden to the insurer. Knowing of this incentive, the insurer would set as a premium the policy's highest indemnity, and no "insurance" would remain. Illinois would not read a policy in a way that made it impossible for people to buy the insurance product they want (here, coverage of negligence and disloyalty by pension fiduciaries). See *Level 3 Communications, Inc. v. Federal Insurance Co.*, 272 F.3d 908 (7th Cir. 2001) (Illinois law).

There is one more reason why Federal Insurance need not indemnify Arthur Andersen for what it agreed to pay the retirees. A clause in the policy commits Arthur Andersen not to settle any claim for more than $250,000 without Federal Insurance's "written consent, which shall not be unreasonably withheld." (The full text of this clause, and of the policy's other material terms, appears in the district court's opinion.) Arthur Andersen didn't ask for the consent or even the comments of its insurers; it presented the deal to them as a *fait accompli*. By cutting Federal Insurance out of the process, Arthur Andersen gave up any claim to indemnity—unless state law makes the policy's coverage clauses and exclusions irrelevant.

Illinois requires an insurer to provide a prompt defense on the insured's demand or initiate a declaratory-judgment action; it treats undue delay in doing one or the other of these things as a forfeiture of any right to benefit from limitations on the policy's scope. See *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150–51, 708 N.E.2d 1122, 1134–35 (1999). The jury concluded that the delay between notice of the *Waters* action

in September 2002 and the declaratory-judgment action filed in February 2003 was unreasonable. The jury might have concluded that Federal Insurance learned, or should have learned, of the *Waters* action in July 2002; Arthur Andersen says that the insurer should have acted without waiting for a request from the broker. To simplify matters we assume that this is so and that the countable delay was seven or eight months.

Treating eight months as excessive is questionable. The state decisions on which Arthur Andersen relies involve longer waits. Although Arthur Andersen relies on a statement in *Ehlco* that delay is unreasonable as a matter of law when the insurer does not file until the case has been settled (186 Ill. 2d at 157, 708 N.E.2d at 1138), the Supreme Court of Illinois did not consider in *Ehlco* whether this is so when the insured settles the litigation so swiftly that even a diligent insurer would not have had time to discuss coverage questions with the client out of court. Some suits are settled the day they are filed; we doubt that the Supreme Court of Illinois meant that such pre-packaged resolutions (common in bankruptcy) require insurers to pay their policy limits, even though the policies do not cover the loss and they had no chance to evaluate the claims before the settlements occurred. Had Arthur Andersen complied with the policy's requirement that any settlement over $250,000 be submitted for the insurer's review, Federal Insurance could have filed its declaratory-judgment action before the settlement occurred.

We need not pursue this issue, however, or ask whether a reasonable jury could have found that eight months is unreasonably long. Illinois recognizes an exception to its estoppel doctrine "[i]f the insured indicates that it does

not want the insurer's assistance or is unresponsive or uncooperative". *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317, 326, 701 N.E.2d 499, 504 (1998). Arthur Andersen's insurance broker did not respond for three months to the insurer's reasonable requests for information needed to evaluate the *Buchholz/Bryce* claim and the potential cost of defense. More important, neither the broker nor Arthur Andersen itself ever asked Federal Insurance to send a team of lawyers to represent it in the *Buchholz/Bryce* suits or the *Waters* suit.

Arthur Andersen retained Mayer Brown directly, and, though it wanted its insurers to pay as much of the bill as possible, Arthur Andersen made it clear that it would control both the defense and the law firm conducting that defense. By not tendering its defense to Federal Insurance, Arthur Andersen gave up any basis for demanding immediate action by the insurer. An insured's need to have legal assistance for its defense from the outset of a suit is the main justification for the rule that Illinois has adopted. When the insured does not want the insurer to *supply* a defense (lest the insurer also *control* the defense), it has no complaint if the insurer takes a while to contemplate the question of indemnity. The urgent need is for a defense to the pending suit; liability for indemnity (the coverage question) can safely be decided later.

What is more, Federal Insurance did not have a duty to defend the *Waters* suit in the first place. The *Waters* complaint is based on contract and nothing but. Arthur Andersen concedes that the *Waters* complaint was transparently outside the scope of the policy. It persuaded the judge to read the allegations of the *Buchholz/Bryce* suits into the *Waters* complaint, on the theory that similar fiduciary allegations might have been added to *Waters*

before it reached judgment. Yet insurers are entitled to evaluate complaints for what they are, rather than what they might be. Illinois requires insurers to supply a defense if a complaint makes allegations within the scope of a policy, even if the plaintiff is unlikely to prevail; it uses a four-corners approach to evaluating the obligation to defend. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 578 N.E.2d 926 (1991). Just so when the complaint omits any allegations within the policy's scope.

True enough, we observed in *Travelers Insurance Co. v. Penda Corp.*, 974 F.2d 823 (7th Cir. 1992) (Illinois law), that a court may consider the allegations of one complaint when trying to interpret the scope of a related complaint. But this means of resolving ambiguities does not come into play when a complaint is unambiguous. *Penda* and the Illinois cases it discusses do not compel insurers to reach outside a straightforward complaint on peril of estoppel or waiver. As we observed: "Focusing on the complaint is necessary because the insurer must determine whether it has an obligation to defend at the outset of the litigation." 974 F.2d at 827.

The parties have filed lengthy briefs addressing many collateral points, but from our perspective none of them matters. Arthur Andersen had a defense to the retirees' suits and neither needed nor wanted Federal Insurance's involvement. Thus the time it took Federal Insurance to commence a declaratory-judgment action does not prevent it from enforcing the policy's terms. All Arthur Andersen cared about was reimbursement for outlays (both counsel and settlement) that it had decided to make without the insurer's involvement. The policy that Arthur Andersen purchased does not cover the retirees'

claims to pensions, however, and though it did cover the fiduciary claims made in the *Buchholz/Bryce* litigation the settlement is for (a portion of) the promised retirement benefits rather than harms caused by careless or disloyal fiduciaries.

The judgment is affirmed, except with respect to the *Waters* plaintiffs. With respect to those retirees it is reversed.