# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 10, 2010

Charles R. Fulbruge III
Clerk

No. 08-41128
No. 08-20401

---

In the matter of: TRANSTEXAS GAS CORP., ET AL

Debtor

JOHN R STANLEY, SR

Appellee-Cross-Appellant

v.

US BANK NATIONAL ASSOCIATION, as Liquidating Trustee

Appellant-Cross-Appellee

---

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA

Plaintiff-Appellee

v.

U S BANK NATIONAL ASSOCIATION

Defendant-Appellant

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before BARKSDALE, SOUTHWICK, and HAYNES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge.

No. 08-41128 & No. 08-20401

This opinion addresses the issues in two related cases. The appeals were not consolidated prior to argument, and we do not consolidate them now. A single opinion is used to explain our decision in each appeal.

In one of the two appeals, the former Chief Executive Officer of TransTexas Gas Corporation, John Stanley, argues that the district court erred by agreeing with the bankruptcy court that severance payments he received from the company were fraudulent transfers. We AFFIRM.

In the related appeal, the liquidating trustee for TransTexas, U.S. Bank National Association, argues that a different district court erred in denying coverage to the estate under a policy issued by National Union Fire Insurance Company. The district court held that the just-described bankruptcy judgment against Stanley was not a "Loss" under the policy. We AFFIRM.

## I.  FACTS AND PROCEDURAL HISTORY

TransTexas Gas Corporation was engaged in exploration, production, and transmission of oil and natural gas. In April 1999, TransTexas filed for Chapter 11 bankruptcy protection. The reorganization plan provided that the company would enter a three-year Employment Agreement with John Stanley, Sr., the company's founder. Stanley would serve as Chief Executive Officer and be one of five directors. The Agreement was effective March 17, 2000.

The Employment Agreement provided that Stanley could be terminated beginning two years after its execution. (His departure was effective a few days before the Agreement's second anniversary, but neither party presents that as an issue.) At termination, Stanley would be entitled to severance pay. If he were dismissed for reasons other than cause, he would receive three million dollars. If he were terminated for cause, his payment would be one and a half million dollars. If he voluntarily resigned, he would be paid no severance.

Despite its reorganization, TransTexas struggled financially. In February 2001, a law firm retained by the Board to investigate allegations of Stanley's

2

wrongdoing found that he could validly be dismissed for cause. However, if Stanley brought suit contesting his termination, the report also concluded that the result would be uncertain. No action was taken in 2001.

Throughout 2001, TransTexas's financial condition was perilous. In late 2001, the Board used funds for current operations from a reserve account intended to make payments to Senior Secured Noteholders. That withdrawal left insufficient funds to make the note payments due in March 2002.

On January 30, 2002, all five members of the Board met. The minutes of that meeting state that the four directors other than Stanley agreed that "the severance option" under Stanley's Employment Agreement should be invoked. Funding would need to be found for the severance payment; it was considered "acceptable" to divert money from the drilling program. There is no indication in the cursory minutes that the directors discussed whether Stanley would be terminated for cause or the effect that would have on the payment.

Between January and March 2002, Stanley remained CEO and a member of the Board as he negotiated the terms of his departure. In March, Stanley and TransTexas agreed that he would resign. On March 14, 2002, the Board executed a "Separation Agreement." It explicitly superseded his Employment Agreement. He was to be paid three million dollars in installments. Stanley received $2,270,794.90 before the payments ceased.

In April 2002, TransTexas purchased an executive and organization liability insurance policy ("the Policy") from National Union. Stanley was an insured for any covered claims that were made during the policy period, regardless of when the incidents giving rise to the claims occurred.

As a result of its financial deterioration, TransTexas in November 2002 filed a second Chapter 11 proceeding in the bankruptcy court for the Southern District of Texas. The bankruptcy court confirmed the creditors' plan for

reorganization in August 2003. Under the plan, a liquidating trust was established with U.S. Bank as the liquidating trustee.

U.S. Bank filed an adversary proceeding against Stanley, seeking to avoid the severance payments. It alleged that the payments violated 11 U.S.C. §§ 547(b) and 548, and the Texas Uniform Fraudulent Transfer Act ("TUFTA"). Tex. Bus. & Com. Code § 24.005 (West 2002). After a two-day trial, the bankruptcy court held that the severance payments constituted both unlawful preferences under Section 547(b) and fraudulent transfers pursuant to Section 548 and TUFTA. Stanley was ordered to repay the over two million dollars he had received, plus attorneys' fees and costs.

On appeal, the district court agreed in most respects. There are two different district courts that entered rulings that are reviewed in our opinion. To keep them distinct, we will refer to this first decision as being that of Chief Judge Hayden Head. He held that Stanley's severance payments were avoidable as fraudulent transfers pursuant to Section 548 and TUFTA, but not as preferential transfers under Section 547(b). Stanley's repayment obligation was unaffected by the partial disagreement with the bankruptcy court.

On appeal now, both parties assert error. U.S. Bank seeks reversal of the district court's holding that the transfers were not preferential under Section 547(b). Stanley argues for reversal of the holding that the severance payments were fraudulent transfers under Section 548 and TUFTA.

Prior to the issuance of Chief Judge Head's opinion, the insurer, National Union, filed for a declaratory judgment against Stanley and U.S. Bank in the United States District Court for the Southern District of Texas. The suit was assigned to Judge Nancy Atlas. National Union sought to have the court declare that it was not liable under the Policy for the judgment entered against Stanley.

The pivotal issue was whether the bankruptcy court's judgment against Stanley constituted a "Loss" under the Policy. Cross-motions for summary

judgment were filed.    In granting National Union's motion, Judge Atlas concluded that the bankruptcy judgment against Stanley was not a "Loss" under the Policy, and even if it were, it fell within the "profit or advantage" exclusion. On appeal, U.S. Bank seeks reversal.

## II. DISCUSSION

We examine the issues raised in these two appeals in the following order. We first analyze whether the payments amounting to more than two million dollars were fraudulent transfers.  U.S. Bank is actually the appellant in that case, as it seeks overturning of the decision that the payments to Stanley were not *preferential* transfers.  Because we hold that the payments were fraudulent under the Bankruptcy Code, we need not consider other possible violations, including TUFTA or Section 547(b).

Once the fraudulent transfer question is answered, we will turn to whether coverage to U.S. Bank under the Policy was properly denied.

### A.    *Fraudulent Transfers Under 11 U.S.C. § 548.*

Stanley's arguments that the district court erred in concluding there was a fraudulent transfer are the only ones we need to consider.   He argues an absence of proof on the following elements of the claim: (1) he was an insider at the time the payments were made to him; (2) TransTexas did not receive reasonably equivalent value in exchange for the payments; (3) there was an intent to hinder, delay, or defraud creditors; and (4) TransTexas was insolvent when the Separation Agreement was made.

"We review the decision of a district court, sitting as an appellate court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court." *In re Jay*, 432 F.3d 323, 325 (5th Cir. 2005).

Findings of fact may not be set aside unless they are clearly erroneous.  *In re Martin*, 963 F.2d 809, 813-14 (5th Cir. 1992).  In examining for clear error, we

review the record as a whole and not just the evidence supporting the finding. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). Stanley alleges that heightened scrutiny must be given to the fact-findings because those issued by the bankruptcy court were "essentially verbatim recitals" of U.S. Bank's proposed findings. *See FDIC v. Texarkana Nat'l Bank*, 874 F.2d 264, 267 (5th Cir. 1989). A more recent description of our duty in such circumstances is that we are to "approach such findings with greater caution, and as a consequence to apply the standard of review more rigorously." *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 409 (5th Cir. 2001). Nonetheless, our basic clear error standard is still the test. *Id.*

Stanley also alleges that irreconcilable fact-findings were made, making the findings as a whole defective. When a court rules on inconsistent legal theories, and in so doing finds irreconcilable facts, the district court's account of the evidence is no longer "plausible in light of the record viewed in its entirety." *See In re Webb*, 954 F.2d 1102, 1104-06 (5th Cir. 1992) (quotation and citation omitted). While error may well be shown when a district court finds two mutually exclusive facts, that is not what occurred here.

Several common facts supported that the transfer to Stanley was both preferential under Section 547(b) and fraudulent under Section 548. When the district court rejected that Section 547(b) applied, it did so due to the legal conclusion that Stanley had to be an insider at the time of the actual payment. For Section 548, the court held it was enough that insider status existed at the time the obligation arose. These conclusions do not impugn the validity of the attendant findings of fact that supported both theories.

With respect to conclusions of law, the bankruptcy court's decisions are reviewed *de novo*. *See Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982).

Both the bankruptcy court and the district court held that TransTexas's severance payments to Stanley were avoidable fraudulent transfers pursuant to

Section 548.    This provision of the Bankruptcy Code protects creditors of insolvent debtors from unlawful pre-filing transfers to company insiders.  If a Chapter 11 debtor has paid an insider with funds that would otherwise belong to the bankruptcy estate, the trustee may be entitled to recover those payments.

An avoidable fraudulent transfer requires (a) an obligation (b) incurred by the debtor for the benefit of an insider (c) made or incurred within two years before the date of petition where the debtor *either* (d) incurred such obligation with actual intent to hinder, delay or defraud a creditor, *or* (e) received less than reasonably equivalent value in exchange for such obligation while the debtor was insolvent or made for the benefit of an insider under an employment contract and not in the ordinary course of business. 11 U.S.C. § 548(a)(1)(A) & (B).[1]

Two elements are clearly satisfied.  The severance payments made to Stanley after his dismissal were obligations incurred by TransTexas within two years of its petition date.

Superficially, it would appear that the third element of Stanley's being an insider is beyond question.  That element is challenged, though, on the basis that

---

[1] (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)  (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)  (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation  . . . , or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(A) & (B).

at the time of the actual payments, Stanley had left the company and was no longer an insider.  We now turn to this, the first of Stanley's issues.

### (1) Payments to an Insider

Stanley devotes a substantial portion of his appellate brief to the argument that he was not an insider as meant by the statute.  Most of that argument is directed towards the separate question of whether the payments should be set aside as preferential transfers.  *See* 11 U.S.C. § 547(b).  If he is also asserting that his departure from the company by the time of the payments matters for a fraudulent transfer under Section 548 of the Bankruptcy Code, that is error.

Under Section 548, it is enough that Stanley was an insider either at the time of the transfer of the funds or at the time the company incurred such obligation.  The language of the statute makes that evident.  A "trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract)," if the debtor "(A) made such transfer or *incurred such obligation*" with the requisite intent, "or (B)(i) received less than a reasonably equivalent value in exchange for such transfer or *obligation . . . .*" 11 U.S.C. § 548(a)(1) (emphases added).

Under Section 548, there is no textual limitation of insider status to the time in which the transfer is made.  Because of our ultimate ruling on this statute, we need not resolve the similar issue under Section 547(b).

Stanley was indisputably an insider at the time he entered into the relevant obligation.  That is enough for Section 548.

### (2) Reasonably Equivalent Value, and

### (3) Intent to Hinder Creditors

We join these two issues because the text of Section 548 makes clear they are alternatives.  In order to affirm, we must conclude there was no clear error in finding that the payments were made either with the intent to hinder, delay, or defraud a creditor, or that the debtor received less than reasonably equivalent

8

value in exchange for the obligation while the debtor was insolvent. We find no reasonable equivalency and therefore do not reach the issue of intent.

The bankruptcy court found that TransTexas did not receive reasonably equivalent value in exchange for its severance payments to Stanley. A bankruptcy court's finding of reasonably equivalent value is a factual determination subject to a "clearly erroneous" standard of review. *In re Dunham*, 110 F.3d 286, 289 (5th Cir. 1997).[2] The question of reasonable equivalence is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *Id.* (citation and quotations omitted).

To measure reasonably equivalent value, we judge the consideration given for a transfer from the standpoint of creditors. *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000). "The proper focus is on the net effect of the transfers on the debtor's estate, [and] the funds available to the unsecured creditors." *Id.* (citation omitted). The bankruptcy court in this case noted that the effect of Stanley's severance payments was removing more than two million dollars from the debtor's estate, making the funds inaccessible to its creditors.

Further, "reasonably equivalent value" means that "the debtor has received value that is substantially comparable to the worth of the transferred property." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994). The bankruptcy court here found that Stanley used overreaching tactics, abusing his

---

[2]    *Matter of Dunham* resolved a prior uncertainty as to the review standard, as the opinion explained. 110 F.3d at 289.

This is not to say that *de novo* review is never appropriate when examining the bankruptcy court's treatment of reasonably equivalent value. We should examine "'*de novo* the methodology employed by the bankruptcy court in assigning values to the property transferred and the consideration received.'" *In re Hannover Corp.*, 310 F.3d 796, 801 (5th Cir. 2002) (quoting *Dunham*, 110 F.3d at 289 n.11). Likewise, where the specific transaction in question gives a debtor reasonably equivalent value as a matter of law, we review that legal conclusion of the bankruptcy court *de novo* as well. *In re Erlewine*, 349 F.3d 205, 209 (5th Cir. 2003). We find no fault with the bankruptcy court's methodology, and there is also no allegation that TransTexas's payments to Stanley constituted reasonable equivalency as a matter of law.

position of authority to obtain favorable terms in the Separation Agreement to which he was not entitled. The district court did not adopt the bankruptcy court's finding that TransTexas received *no* value for Stanley's resignation. It did agree that Stanley's concessions to the company dd not reasonably equate in value to the payments made under the Separation Agreement.

Stanley contends that he provided reasonably equivalent value in this way. The Board made its decision to terminate him in January 2002 when the Employment Agreement was in effect. An obligation immediately arose to pay him three million dollars. Consequently, the March 2002 Separation Agreement was merely memorializing the debt and structuring the payments. Paying that amount to Stanley was a dollar-for-dollar satisfaction of a debt.

To support the legitimacy of the debt, Stanley argues that his 2000 Employment Agreement was specifically approved as part of the reorganization plan in the first bankruptcy. That agreement allowed as "liquidated damages" a payment of three million dollars if Stanley were terminated without cause. He even argues there is a *res judicata* effect from the earlier bankruptcy court's approval of the contract itself, making the payment incontestable. These claims gloss over the fact that the issue is not the validity of the 2000 Employment Agreement but what rights Stanley had under it in 2002.

The bankruptcy court found there was no value to the 2002 agreement to pay three million dollars. The district court assigned some value to the exchange, such as Stanley's release and covenant not to sue. Stanley suggests that by agreeing to "go quietly," he provided benefit to the company.

The problem factually for each court that has examined the early 2002 Separation Agreement is that at least for a year prior to the termination, there had been evidence of good cause for which Stanley could be terminated. Such a termination would have reduced by half the severance payment. Stanley actually resigned, which under the Employment Agreement would have entitled

the company to pay him nothing. The bankruptcy court specifically found that Stanley's departure was a voluntary resignation, entitling him to nothing. The district court disagreed, holding that the resignation was part and parcel of the Separation Agreement, which created the right to severance pay if he resigned. Regardless, there were substantial obstacles to Stanley's getting three million dollars for his departure. TransTexas nonetheless agreed to the payment. Based strictly on the legal analysis of the contracts, we find no error in the fact-finding that this was not reasonable equivalence.

Stanley also argues that some evidence had to be presented by the trustee to show a lack of equivalence. Neither expert nor lay testimony was offered to support that three million dollars was more than Stanley's agreement to resign was worth. Besides lay or expert testimony, Stanley argues the bankruptcy court also held that a three million dollar debt existed as of January 2002.

The bankruptcy court concluded that the three million dollar debt arose in January 2002 when the Board decided to terminate Stanley. The Board's decision was not to terminate him for cause; "the decision not to terminate Stanley for cause (in fact, he resigned) was in effect a self-fulfilling prophesy" to justify paying three million dollars instead of half that amount if he were terminated for cause. Those conclusions were stated in resolving the issue of preferential transfers under Section 547(b). We see in them only an analysis of what the Board's decision in January to terminate and to pay three million dollars did to the issue of creation of an obligation. It does not undermine other findings that the obligation was disproportionate to what was legally owed.

Stanley cites a decision in which expert testimony was found necessary to overcome a presumption of reasonableness regarding the salaries and bonuses that were paid. *Askanase v. Fatjo*, No. Civ.A.H-91-3140, 1996 WL 33373364, at *9-11 (S.D. Tex. Apr. 1, 1996), *aff'd,* 130 F.3d 657 (5th Cir. 1997). What someone's labor is worth seems to us a much different proposition than whether

11

the straightforward terms of an employment agreement could fairly be interpreted to require payment of three million dollars or half that amount. Putting a value on the uncertainties of litigation might have allowed the admission of specific testimony, lay or expert, but we do not conclude that the absence of such testimony is fatal.

TransTexas did not receive reasonably equivalent value for providing Stanley greater compensation than required by the terms of the Employment Agreement. The district court agreed that even under the most favorable circumstances, Stanley could only have been entitled to $1.5 million under the Employment Agreement, basing that on the conclusion that there was good cause for terminating him. There is simply too much disparity between TransTexas's payments and any concessions Stanley may have made for his expedient exit from the company. *See In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1127 (5th Cir. 1993).[3]

The reasonable equivalency fact-finding was not clearly erroneous. Even under a slightly more intense look caused by the bankruptcy court's nearly verbatim adoption of the proposal of one party, we still see no error.

*(4) Insolvency of TransTexas*

TransTexas was found either to be insolvent or became insolvent by virtue of the financial obligations incurred by the three million dollar Separation Agreement. Stanley challenges the insolvency calculation used by the bankruptcy court. Similar to what we decided on the earlier question of the timing of Stanley's insider status, we conclude that the insolvency issue only applies to preferential transfers under Section 547(b). We explain.

---

[3] If Stanley were entitled to some payment but one substantially less than three million dollars, no one has argued that this would make it error to declare the entire transaction fraudulent. Regardless, Section 548 speaks in terms of avoiding a "transfer," not part of a transfer, when there is not reasonably equivalent value.

The language in Section 548 regarding fraudulent transfers is clear that there are different ways in which such transfers can occur.  One alternative is that a transfer have been made when the debtor was insolvent. 11 U.S.C. § 548(a)(1)(B)(ii)(I).  Another alternative is the transfer be made "to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business." *Id.* § 548(a)(1)(B)(ii)(IV).  That latter provision applies.  As we have discussed, Stanley was an insider at the time the obligation was incurred.

*(5) Trustee's Fees and Costs*; *Stanley's Proof of Claim*

For these reasons, the concluding issues raised by Stanley regarding the need to set aside the order to pay the trustee's fees and costs, and to allow Stanley's claim for three million dollars, must fail.  His argument is based on the premise that we would agree with his arguments regarding the fraudulent transfer.  We have not and thus reject these final points.

B.    *National Union's Policy Coverage for a "Loss."*

As mentioned earlier, TransTexas had executive and organization liability coverage through National Union.  Stanley's defense costs for the adversary proceeding in bankruptcy court were paid under the Policy with a reservation of rights.  On April 11, 2007, the judgment was entered avoiding the payments to Stanley.  On May 10, U.S. Bank notified Stanley that if he did not promptly pay the judgment, a garnishment would be filed against his insurance carriers.  Presumably, National Union learned of this demand.  On June 12, National Union sued both Stanley and U.S. Bank, seeking a declaratory judgment that nothing was owed under the Policy.

In granting summary judgment to National Union, Judge Atlas held that the bankruptcy judgment against Stanley did not constitute a "Loss" under the Policy.  In the alternative, the judgment fell within the Policy's "profit or advantage" exclusion.  On appeal, U.S. Bank argues that both conclusions were

error.  After insisting in the bankruptcy that the transfers were preferential and fraudulent, U.S. Bank argues now that Stanley was nonetheless entitled to be paid.  U.S. Banks asserts that the defect found by the bankruptcy court was in "the timing of TransTexas' payments to Stanley" and "that TransTexas intended to hinder, delay or defraud its creditors."  There was not, U.S. Bank argues, any holding that Stanley was not owed the money.

The summary judgment was proper if the pleadings and evidence show that there was no genuine issue as to any material fact and that National Union was entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The interpretation of an insurance policy is a question of law that we review *de novo.  Allstate Ins. Co. v. Disability Servs. of the Southwest, Inc.*, 400 F.3d 260, 263 (5th Cir. 2005).  The parties agree that Texas substantive law applies in this diversity case.

Under Texas law, insurance polices are construed according to the same rules of construction used to interpret contracts.  *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).  The court's primary concern is effectuating the parties' expressed intent.  *Id.*  If an insurance policy uses unambiguous language, it must be enforced as written.  *Id.*  A policy's exclusions and limitations are construed narrowly to avoid exclusion of coverage.  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Willis*, 296 F.3d 336, 339 (5th Cir. 2002) (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)).  The insured bears the burden to prove that his claim is covered by the policy, and the insurer bears the burden to prove that an exclusion applies.  *Fiess v. State Farm Lloyds*, 392 F.3d 802, 807 (5th Cir. 2004) (applying Texas law).

Stanley suffered a loss in the colloquial sense that the bankruptcy court required him to pay a judgment.  However, the critical issue here is whether the repayment of the amounts received, which we have concluded were avoidable

14

fraudulent transfers, constitute an insurable "Loss" under the Policy.    A definition of the relevant term is in the Policy.

> "Loss" means damages, settlements, judgments (including pre/post-judgement interest on a covered judgment), Defense Cost and Crisis Loss; however, "Loss" (other than Defense Costs) shall not include . . . (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

This language is unambiguous and will be enforced as written. *Don's Bldg. Supply*, 267 S.W.3d at 23. Accordingly, the bankruptcy judgment against Stanley is not a "Loss" within the meaning of this policy if the judgment is uninsurable under Texas law.

In concluding that the judgment was not insurable, the district court held that it provided restitution. In one of the cases on which the court relied, Humble Oil and Texaco sued Nortex for drilling at a slant such that its wells were completed beneath land the plaintiffs leased. *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 490 (Tex. App.—Dallas 1970, no writ). The parties settled. Nortex then made a demand on its insurer, Harbor Insurance Company, for payment of Nortex's "ultimate net loss." *Id.* at 491. Harbor denied the claim, and Nortex brought suit in Texas state court. *Id.*

The Texas court held that when Nortex settled its claims with Humble and Texaco, it did not sustain a "Loss" within the meaning of the insurance policy, because Nortex was merely paying for oil that it had removed and sold from land leased to Humble and Texaco. *Id.* at 493-94. The court further explained:

> An insured (under such a policy as we have here) does not sustain a covered loss by restoring to its rightful owners that which the insured, having no right thereto, has inadvertently acquired . . . . The insurer did not contract to indemnify the insured for disgorging that to which it was not entitled in the first place, or for being deprived of profits to which it was not entitled.

*Id.* at 494.

In the other decision relied upon by the district court, the Seventh Circuit construed the term "Loss" in an insurance policy[4] similar to the Policy involved here. *Level 3 Commc'ns Inc. v. Fed. Ins. Co.*, 272 F.3d 908 (7th Cir. 2001). The shareholders brought suit alleging that they were defrauded by Level 3. *Id.* at 909. After the parties reached a settlement, Level 3 sought to be reimbursed by its directors' and officers' liability policy insurer, Federal Insurance Company.

The court held that "a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain." *Id.* at 910. Damages paid by Level 3 to the plaintiffs for which Level 3 sought reimbursement were "restitutionary in character." *Id.* The court also explained that the "insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." *Id.* at 911. We agree with this interpretation and hold that the return of funds due to a fraudulent transfer is in the nature of restitution.

U.S. Bank argues that the bankruptcy court never found that Stanley was required to return the severance payments on the basis that he was never legally entitled to them. It argues that unlike "the insured in *Nortex*, Stanley had a clear contractual right to the severance payments at the time he received them." Contrasting *Level 3*, it argues "Stanley did not steal his severance or receive them by a means other than a duly executed and binding contract, the Separation Agreement." We disagree. Payments fraudulent as to creditors that must therefore be repaid due to bankruptcy court order is a disgorgement of ill-gotten gains and a restitutionary payment.

---

[4]    The directors' and officers' insurance policy purchased by Level 3 defined "Loss" as "the total amount which any Insured Person becomes legally obligated to pay . . . including, but not limited to . . . settlements." *Level 3*, 272 F.3d. at 909.

We also find it necessary to return to our observation that Stanley, though never legally entitled to a three million dollar severance payment, *may* have been entitled to something less. Had Stanley and the company not engaged in the transfer that has been declared fraudulent under Section 548, they might have agreed on a lesser amount that would represent a reasonable severance payment. The fact remains, though, that no such agreement was reached. We noted a similar point in our discussion of Section 548. The parties have cited neither to a provision in the Code nor to precedent to support that making more than a reasonably equivalent exchange is fraudulent only for the excess amount. Because of the bankruptcy laws, Stanley was entitled to none of the payment. U.S. Bank's arguments that depend on a holding that Stanley was entitled to the payment are rejected.

U.S. Bank also characterizes the issue as being whether severance payments set aside under bankruptcy law are uninsurable under Texas law, not whether restitution is uninsurable under Texas law. We need not address the argument in the abstract – this judgment was restitutionary in nature.

U.S. Bank bore the burden of proof that its claim was covered by the policy. *Fiess*, 392 F.3d at 807. U.S. Bank did not meet that burden.[5]

In Case No. 08-41128, we AFFIRM the district court on the basis that TransTexas's payments to Stanley were avoidable fraudulent transfers under Section 548.

In Case No. 08-20401, we AFFIRM the district court's judgment in favor of National Union.

---

[5] In light of our holding, we need not address the district court's alternative that even if the bankruptcy judgment did constitute a "Loss," it would fall within the Policy's "profit or advantage" exclusion.

17