In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3522

RYERSON INC.,

*Plaintiff-Appellant*,

*v.*

FEDERAL INSURANCE COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 4173—**Elaine E. Bucklo**, *Judge*.

ARGUED FEBRUARY 16, 2012—DECIDED APRIL 12, 2012

Before POSNER, RIPPLE, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. This diversity suit, governed by Illinois law because filed in a district court located in that state and neither party argued choice of law, *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010), pits an insured, Ryerson, against its liability insurer, Federal Insurance Company. The district court granted summary judgment in favor of the insurance company.

In 1998 Ryerson (actually a predecessor, but we can disregard that detail) sold a group of subsidiaries to EMC Group, Inc. for $29 million. The following year EMC sued Ryerson, seeking rescission of the sale and restitution of the purchase price. The ground was that Ryerson had concealed an ominous impending development affecting one of the subsidiaries: the subsidiary's largest customer had declared that unless it slashed its prices the customer would build its own plant and stop buying from the subsidiary. The customer repeated the demand for a price cut to EMC when EMC acquired the subsidiary from Ryerson; and when EMC failed to accede to the demand, the customer, as it had threatened to do, took its business elsewhere. EMC's suit charged Ryerson with fraudulent concealment intended to induce EMC to buy the subsidiary, breach of contract (the contract for the sale of the subsidiaries), and breach of warranty (violation of assurances that Ryerson had given EMC in the contract of sale).

Federal Insurance Company had issued Ryerson an "Executive Protection Policy," a liability insurance policy that required Federal both to indemnify it for judgment and settlement costs, and to reimburse it for defense costs, reasonably incurred by Ryerson in suits arising from risks covered by the policy. Federal refused Ryerson's demand for reimbursement of defense costs, on the ground that EMC's claim against Ryerson was not a covered risk.

Three years into EMC's suit against Ryerson, the parties settled, with Ryerson agreeing to make "a post-

closing price adjustment" of $8.5 million "reflecting a change in the purchase price paid by EMC to Ryerson for the purchase" of the subsidiary that had gotten into trouble with its customer. (Ryerson reported this as a "selling price adjustment" on its Form 10-K.) The settlement thus gave EMC a partial refund of the price it had paid for the subsidiaries. With Federal adhering to its position that EMC's claim against Ryerson was not a covered risk, and thus refusing to indemnify Ryerson for the cost of the settlement, Ryerson brought this suit for a declaratory judgment that Federal's insurance policy covered the $8.5 million that Ryerson had refunded to EMC to settle the latter's suit.

The insurance policy covers "all LOSS for which [the insured] becomes legally obligated to pay on account of any CLAIM . . . for a WRONGFUL Act [elsewhere defined in the policy to include a 'misleading statement' or 'omission'] . . . allegedly committed by" the insured. Federal denies that "loss" includes restitution paid by an insured, as distinct from damages, which are expressly denoted in the policy as a covered loss. Federal is right; for otherwise fraud would be encouraged. Ryerson received $29 million from EMC for the subsidiaries, and agreed to give back $8.5 million to settle EMC's fraud claims against it. The refund represented a return of part or maybe all of the profit that Ryerson had obtained by inducing EMC to overpay. If Ryerson can obtain reimbursement of that amount from the insurance company, it will have gotten away with fraud. It will get to keep $29 million ($20.5 from EMC after the settlement and $8.5 million from Federal) even though, if EMC's claim

that Ryerson agreed to settle was not completely meritless, some portion of the $29 million was proceeds of fraud.

If disgorging such proceeds is included within the policy's definition of "loss," thieves could buy insurance against having to return money they stole. No one writes such insurance. See *Scottsdale Indemnity Co. v. Village of Crestwood*, No. 11-2385, 2012 WL 769730, at *3, *5 (7th Cir. March 12, 2012) (Illinois law); *Federal Ins. Co. v. Arthur Andersen LLP*, 522 F.3d 740, 743-44 (7th Cir. 2008) (ditto); *Mortenson v. National Union Fire Ins. Co.*, 249 F.3d 667, 671-72 (7th Cir. 2001) (ditto), and no state would enforce such an insurance policy if it were writ-ten. *Id*. at 672; *Level 3 Communications, Inc. v. Federal Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001). You can't, at least for insurance purposes, sustain a "loss" of some-thing you don't (or shouldn't) have. *Id.*; *In re TransTexas Gas Corp.*, 597 F.3d 298, 308-11 (5th Cir. 2010); *Safeway Stores, Inc. v. National Union Fire Ins. Co.*, 64 F.3d 1282, 1286 (9th Cir. 1995). And so there is no insurable interest in the proceeds of a fraud. Cf. *Grigsby v. Russell*, 222 U.S. 149, 154-55 (1911) (Holmes, J.); 3 *Couch on Insurance* §§ 41:3, 42:57, pp. 41-12, 42-96 (3d ed. 2011).

Whether a claim for restitution is based on fraud or on some other deliberate tortious or criminal act, or at the other extreme of the restitution spectrum merely on an innocent mistake or the rendition of a service for which compensation is expected but contracting is infeasible (as when a physician ministers to a person who collapses unconscious on the street); and whether

the plaintiff is seeking the return of property or the profits that the defendant made from appropriating it, a claim for restitution is a claim that the defendant has something that belongs of right not to him but to the plaintiff. *Tull v. United States*, 481 U.S. 412, 424 (1987); *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 957-58 (7th Cir. 2006); *Braunstein v. McCabe*, 571 F.3d 108, 122 (1st Cir. 2009); *Restatement (Third) of Restitution & Unjust Enrichment* § 1, comment c (2011); 1 Dan B. Dobbs, *Law of Remedies* § 4.1(1), pp. 550-54 (2d ed. 1993). A claim for "damages" in the proper sense of the word is different. If a car driven negligently hits and injures a pedestrian, the pedestrian will sue the driver for the monetary equivalent of the harm done to him, not for the "profit" that the accident generated for the driver. It generated no profit; it gave him nothing.

EMC restyled its claim against Ryerson as one for damages after it sold the subsidiary (thereby mooting its claim to unwind the purchase). But the label isn't important. *Level 3 Communications, Inc. v. Federal Ins. Co.*, *supra*, 272 F.3d at 910-11; *Pan Pacific Retail Properties, Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 966-69 (9th Cir. 2006); *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1115 (9th Cir. 2006). EMC was seeking to recover a profit made at its expense by Ryerson's fraud, which means that if the insurance company were liable to Ryerson, Ryerson would get to keep profits of fraud. Having to surrender those profits was not a "loss" to Ryerson within the meaning of the insurance policy, as we held in the nearly identical case of *Level 3 Communications, Inc. v. Federal Ins. Co.*, *supra*, 272 F.3d at

910; see also *St. Paul Fire & Marine Ins. Co. v. Village of Franklin Park*, 523 F.3d 754, 756-57 (7th Cir. 2008); *In re TransTexas Gas Corp., supra*, 597 F.3d at 310; *Republic Western Ins. Co. v. Spierer, Woodward, Willens, Denis & Furstman*, 68 F.3d 347, 351-52 (9th Cir. 1995); *Bank of the West v. Superior Court*, 833 P.2d 545, 553 (Cal. 1992).

A judgment or settlement in a fraud case could involve a *combination* of restitution and damages, and then the insurance company would be liable for the damages portion in accordance with the allocation formula in the policy. *Pan Pacific Retail Properties, Inc. v. Gulf Ins. Co., supra*, 471 F.3d at 967-69; *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co., supra*, 457 F.3d at 1114-16. EMC's complaint against Ryerson demanded "restitution of the monies paid for [the subsidiary] . . . including transaction costs." Reimbursing EMC's transaction costs would not be restitution because Ryerson gained nothing from the money that EMC paid its lawyers and accountants to handle the acquisition. But Ryerson's lawyer concedes that his client made no effort to allocate its loss between the loss of ill-gotten gains and other costs, so any claim to those costs has been forfeited.

Ryerson has, however, another ground of appeal. When it first asked Federal Insurance Company to cover the $29 million "loss," Federal refused on grounds that it no longer asserts, not on the "no loss" ground that it prevailed on in the district court and that convinces us as well. Ryerson argues that Federal's change of position violates the doctrine of "mend the hold," which

forbids the defendant in a breach of contract suit (which Ryerson's suit against Federal is—a suit charging breach of the insurance contract) to change its defenses, at least without a good reason to do so, see *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1123 (7th Cir. 1998), in the midst of the suit. *Schuyler County v. Missouri Bridge & Iron Co.*, 100 N.E. 239, 240 (Ill. 1912); *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251-52 (7th Cir. 1996) (Illinois law); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1013 (7th Cir. 1985) (ditto); cf. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362-64 (7th Cir. 1990) (ditto); Robert H. Sitkoff, Comment, " 'Mend the Hold' and *Erie*: Why an Obscure Contracts Doctrine Should Control in Federal Diversity Cases," 65 *U. Chi. L. Rev.* 1059 (1998).

But at least as understood in Illinois, mend the hold does not forbid the defendant to add a defense after being sued; that is, it does not confine him to the defense (or defenses) that he announced *before* the suit. To require a potential defendant to commit irrevocably to defenses before he is sued would be unreasonable to the point of absurdity. Until he receives and reads the complaint he cannot have a clear idea of how best to defend. He shouldn't be put to the expense of having to identify and articulate all possible legal defenses to a suit unless and until there is a suit. The only lasting effect of the expansive interpretation of the doctrine urged by Ryerson would be that insurance companies would refuse to offer any explanation for denying coverage until the insured sued—as Federal would have been entitled to do, *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, *supra*,

766 F.2d at 1013—leaving insureds to speculate on the grounds for denial and thus precipitating lawsuits many of which would prove groundless.

And finally Federal's change of defenses could not have harmed Ryerson, because in denying coverage Federal told Ryerson it was reserving the right to add supplemental grounds for the denial. Compare *Progressive Ins. Co. v. Brown ex rel. Brown*, 966 A.2d 666, 668-69 (Vt. 2008). When there is no prejudice to the opposing party, invoking the doctrine of mend the hold to bar a valid defense is overkill. See *Trossman v. Philipsborn*, 869 N.E.2d 1147, 1166-67 (Ill. App. 2007); *Larson v. Johnson*, 116 N.E.2d 187, 191-92 (Ill. App. 1953); cf. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

AFFIRMED.