In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 11-2762 & 11-2771

AMERISURE INSURANCE COMPANY,

*Plaintiff-Counter-Defendant-Appellant,*

*v.*

NATIONAL SURETY CORPORATION,

*Defendant-Cross-Claimant-Appellant,*

*v.*

SCOTTSDALE INSURANCE COMPANY,

*Defendant-Cross-Claimant-Appellee.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-00866-WTL-DKL—**William T. Lawrence**, *Judge.*

ARGUED JANUARY 18, 2012—DECIDED AUGUST 17, 2012

Before BAUER, MANION, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This litigation arises out of a
dispute over insurance coverage for work-related

injuries sustained by the employee of a subcontractor. Indiana Steel Fabricating (ISF) submitted and won a bid to perform the steel fabrication work for a project. ISF then engaged Central Steel Erectors as a subcontractor. In the course of that work, Brian Colip, a Central Steel employee, fell from a roof and injured himself. He filed suit against ISF under a theory of vicarious liability and settled his claims for $2.9 million. Now ISF's insurers, Amerisure Insurance Company (Amerisure) and National Surety Corporation (National), and Central Steel's insurer, Scottsdale Insurance Company (Scottsdale), are quarreling over which of them is responsible for bearing the cost of that settlement. The district court ruled that each one was liable for a share: Amerisure for $1 million, Scottsdale for $1 million, and National for $900,000. For the reasons that follow, we affirm.

## I

In November 2005, Mark Swanson Associates, Inc., hired ISF to complete steel fabrication work for a construction project in Indiana. In October 2006, ISF hired Central Steel to perform the necessary steel erection work. As part of that arrangement, ISF and Central Steel signed a subcontract in which Central Steel explicitly agreed to procure adequate insurance and to "defend, indemnify and hold harmless [ISF] . . . from and against all claims, actions, judgments, damages, losses and expenses" related to the agreement.

In order to fulfill its obligations, Central Steel purchased two insurance policies from Scottsdale. The first

was a $1 million commercial general liability policy (the Scottsdale CGL policy), and the second was a $2 million umbrella insurance policy (the Scottsdale Umbrella policy). ISF also carried general and umbrella coverage. It had purchased $1 million in commercial general liability coverage from Amerisure and $7 million in umbrella coverage from National.

In November 2006, one month after ISF hired Central Steel, Brian Colip (one of Central Steel's employees) was seriously injured at work when he fell 30 feet through a hole in the roof of a building. Colip filed suit against ISF, arguing that ISF owed him a non-delegable duty of care and was therefore vicariously liable for his injuries. Colip eventually settled that suit for $2.9 million, and the three insurance companies paid the settlement amount according to the terms of a funding agreement. That agreement provided that Scottsdale would pay $1 million out of the Scottsdale CGL policy and $950,000 out of the Scottsdale Umbrella policy, while Amerisure would pay the remaining $950,000. Initially, National had no obligation to contribute. The agreement explicitly reserved the rights of the parties to seek reimbursement or contribution from each other. Amerisure took advantage of that provision and filed suit against Scottsdale and Central in the United States District Court for the Southern District of Indiana. Scottsdale responded with counter- and cross-claims against Amerisure and National. The district court dismissed Central from the litigation and granted summary judgment in favor of Scottsdale, ruling that it had no obligation to pay under its umbrella policy. It thus awarded Scottsdale

$50,000 from Amerisure (thereby exhausting Amerisure's $1 million policy) and the remaining $900,000 from National. Amerisure and National now appeal.

## II

The primary issue on appeal relates to Scottsdale's obligation to contribute to Colip's settlement under the Scottsdale Umbrella policy. Scottsdale argues that the Umbrella policy contains an explicit exclusion that exempts it from paying; Amerisure and National counter that Scottsdale is estopped from relying on that provision, and in any event it does not apply here.

### A

As usual, in order to resolve the dispute we must turn to the governing policy to see what it says. In the Scottsdale Umbrella policy, we find a provision entitled the "Cross Liability Exclusion," which says that:

> This insurance does not apply to 'bodily injury,' 'property damage' or 'personal or advertising injury' arising out of a claim or suit brought by any insured against another insured.

The parties all agree that Colip suffered "bodily injury," and they all accept that ISF and Colip are both "insured" under policy. Amerisure and National argue, however, that Colip's injury did not "aris[e] out of a claim or suit." As they see it, Colip's *injury* arises out of a workplace accident, but the *liability* for that injury arises out of

Colip's lawsuit. Ergo, they conclude, the Exclusion does not apply to Colip's case, even though it might apply if a landlord were injured while trying personally to evict a tenant, or if someone were to slip and fall while filing papers with a court.

This does not strike us as a sensible reading of the policy language; instead, it is a strained effort to avoid the natural meaning of the words while at the same time preserving just enough to avoid making the provision illusory. The appellants stridently argue that because this litigation is between insurance companies, we must construe the Scottsdale Umbrella policy from "a neutral stance," *Indiana Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.*, 291 N.E.2d 897, 899 (Ind. 1973). From that, they reason that the risk of any drafting error goes to the drafter. But even if we agreed with them that Scottsdale's policy is unclear, their conclusion does not follow from *Indiana Lumbermens.* What the Supreme Court of Indiana actually requires in this type of contract litigation, and what we will accordingly do, is to "seek out the general intent of the contract from a neutral stance." *Id.* at 899; see also *Burkett v. American Fam. Ins. Grp.*, 737 N.E.2d 447, 452-53 (Ind. Ct. App. 2000).

Here, the straightforward way to read the policy exclusion is as one that applies to lawsuits between two parties covered by the same insurance—or as the policy puts it, "a claim or suit brought *by* any insured *against* another insured." (Emphasis added.) This makes sense. Without the Exclusion, parties insured under the same policy would have no disincentive to sue one an-

other, since only the insurance company would ultimately bear the cost of the judgment. This sets up what is known to economists as a moral hazard, because the party taking the risk will not bear the costs of its behavior. The Exclusion counteracts that problem by eliminating the possibility of a third party's subsidization of such a lawsuit. See *Miller v. St. Paul Mercury Ins. Co.*, 683 F.3d 871, 872 (7th Cir. 2012). We are satisfied that the Exclusion's language—including its title, which clarifies that it applies to instances of cross-liability—reflects the intent of Scottsdale and Central Steel not to purchase insurance that would cover personal injury lawsuits between insured parties under the Umbrella policy.

In response, Amerisure and National argue that it is this reading of the Cross Liability Exclusion that impermissibly makes the policy illusory, because it purports to grant coverage for Central Steel's indemnity obligations to ISF, but then it does not actually provide any such coverage. But this does not do the policy justice. There are many instances in which a company might need to call on its commercial general liability insurance (or an umbrella extension of that insurance) where third parties are involved. By excluding only coverage for suits between two named insured parties, the policy remains in full force for cases that involve a third-party (*e.g.,* delivery people, visitors to the site, or other contractors not involved in the steel work). The worst one might imagine is that, by agreeing to the Cross Liability Exclusion, Central Steel failed to fulfill its obligation to ISF under the subcontract to procure

adequate indemnity coverage. That question, however, is not before us. We are satisfied both that the Exclusion applies to this case and that this does not render the policy illusory.

### B

Having established that the Cross Liability Exclusion saves Scottsdale from any obligation to draw on the Umbrella policy to fund Colip's settlement, we move on to the second question the parties have raised: Did Scottsdale wait too long to assert its rights under the Exclusion? Amerisure and National argue that Scottsdale did not bring up the Exclusion until too late in the game, and that this late assertion constitutes an unfair attempt by Scottsdale to "mend its hold."

The mend-the-hold doctrine (which acquired its name from a nineteenth-century wrestling term, see *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990)) prevents a defendant in contract litigation from "chang[ing] its defenses" midstream without any reason for doing so. *Ryerson Inc. v. Federal Ins. Co.*, 676 F.3d 610, 614 (7th Cir. 2012). Appellants argue that Scottsdale's letter of June 24, 2008, and other pre-trial communications, did not alert them to Scottsdale's intent to rely on the Exclusion; instead, they say, Scottsdale mentioned only a number of other, materially different, defenses. This shift in strategy, they assert, prejudiced them. We find this argument unavailing for several reasons.

In the first place, it is not at all clear that the Indiana courts have any intention of adopting or applying the mend-the-hold doctrine. We can find only one decision by any Indiana state court that mentions it, and that case was decided over eight decades ago, in 1928. See *National Hame & Chain Co. v. Robertson*, 161 N.E. 851 (Ind. Ct. App. 1928). Indeed, at present the doctrine is applied in only a minority of the states. See Robert H. Sitkoff, Comment, *'Mend the Hold' and* Erie*: Why an Obscure Contracts Doctrine Should Control in Federal Diversity Cases*, 65 U. Chi. L. Rev. 1059, 1068-77 (1998). Absent any indication that the Indiana courts would apply the doctrine at all, we see no warrant for taking the initiative to use it here.

But even if we thought that the Indiana courts might borrow the doctrine from their neighbors in Illinois, or if another form of estoppel might apply, Amerisure's and National's substantive arguments are unavailing. Scottsdale's June 24 letter is not as constraining as the appellants urge. In fact, Scottsdale not only specifically stated its "position" that the Scottsdale Umbrella coverage was subordinate to the Amerisure policy, but it also explicitly reserved Scottsdale's "right to assert defenses regarding any of the other terms, conditions, or exclusions of this policy." Thus, the parties had ample notice of Scottsdale's intent to "assert all defenses to coverage available to it under the policy" (emphasis added). And although it is true that Scottsdale did not specifically invoke the Cross Liability Exclusion in these pre-trial communications, we recently said that "mend the hold does not forbid the defendant to add

a defense after being sued" because "[t]o require a potential defendant to commit irrevocably to defenses before he is sued would be unreasonable to the point of absurdity." *Ryerson*, 676 F.3d at 614.

Finally, we doubt that Amerisure and National were unfairly surprised or prejudiced by the allegedly "eleventh hour" assertion of the Cross Liability Exclusion at litigation. Just as Scottsdale had warned it would do before the commencement of this litigation, its complaint stated its intention to rely on the exclusions contained in the Scottsdale Umbrella policy. The appellants concede that they had access to the complete terms of the Scottsdale Umbrella policy throughout this litigation. Amerisure and National easily could have uncovered the Cross Liability Exclusion and prepared for its eventual introduction in the district court. We decline, under these circumstances, to find that the appellants were prejudiced by Scottsdale's litigation conduct.

C

Lastly, Amerisure and National argue that the mend-the-hold doctrine prevents Scottsdale from recovering any more than $450,000 (rather than $950,000), because it inadvertently typed a "4" instead of a "9" in the first column in some of its filings. Although this does strike us as quite a careless error—the 4 key on a normal keyboard is nowhere near the 9 key, even on the numeric pad—we decline to hold that these isolated errors limit Scottsdale's available scope of relief. As the district court noted, Scottsdale's trial filings repeatedly

reflect its intention to recoup all payments made under its umbrella policy. Scottsdale's "Statement of Special Damages," a document required under the district court's Case Management Plan for this litigation, clearly stated that it was seeking "Nine Hundred Fifty Thousand and No Cents Dollars ($950,000.00)." Reading the file as a whole, there is no doubt that Scottsdale was trying to recover the full $950,000 that it had been required to contribute from the Umbrella policy. We agree with the district court that Scottsdale was entitled to recoup these funds pursuant to the policy's terms and that there are no equitable bars to Scottsdale's recovery of all such payments it has made. The judgment is AFFIRMED.